C A T H E R I N E M. B R O W N, L. L. C.
P.O. BOX 9058
MORRISTOWN, NEW JERSEY 07963-9058
(973) 984-9300
FACSIMILE (973) 984-6590

E-MAIL: CMB.CERTCIVATTY@ALLVANTAGE.COM

CERTIFIED BY THE SUPREME COURT OF NEW JERSEY
AS A CRIMINAL and CIVIL TRIAL ATTORNEY

MEMBER NJ AND PA BARS

April 25, 2007

Hon. Christine O.C. Miller, J.C.F.C.
U.S. Court of Federal Claims
717 Madison Place, N.W.
Washington, D.C. 20005

Re: Daniels v. United States
C.A.: 06-851 T

Dear Judge Miller:

Please accept this letter brief in lieu of a more formal brief on behalf of the joint-taxpayer plaintiffs, Charles and Linda Daniels, in opposition to the Government's motion to dismiss the Complaint for want of subject matter jurisdiction per *RCFC 12(b)(1)*.

TABLE OF CONTENTS

PROCEDURAL HISTORY AND STATEMENT OF FACTS 2

ARGUMENT

The Court Has Subject Matter Jurisdiction 6

CONCLUSION 19

CERTIFICATE OF SERVICE 20

PROCEDURAL HISTORY AND STATEMENT OF FACTS

This is a case of the American dream of economic opportunity fallen down a rabbit hole. Like most of us, Charles Daniels supports his wife and two dependent children as a wage earner. (Daniels aff. at par. 3). His skills are such that in 1995 he was offered the opportunity to become the founding technical officer of a start-up telecommunications company known as Nextlink Communications, LLC. To induce him to share in the risks of the venture, Mr. Daniels was granted an equity stake in the company by means of purchase options of membership units.

The company went public in 1997 (Nextlink, Inc.; later renamed XO Communications) and the membership units were converted to shares of common stock. Mr. Daniels thus became eligible for unqualified incentive stock options. (Complaint, par. 5).

In late 1999, a new management team was installed and Mr. Daniels was fired. Company rules required Mr. Daniels to exercise the stock options within a limited time frame, so on January 12, 2000 he exercised his remaining stock options and became the registered owner of 235,226 shares of Nextlink stock. (Complaint, par. 6).

Unbeknownst to Mr. Daniels and to the public at large, during that period the telecommunications sector of the stock market was being fraudulently manipulated by several Wall Street investment banks; a fact only later exposed through the efforts of the SEC and the New York Attorney General. *See, e.g., SEC v. Citigroup Global Markets, etc., http://www.sec.gov /litigation/complaints/ comp18111.htm. See also,* D. Reingold, *Confessions of a Wall Street Analyst*, 2006(Collins)(with bibliography at 316-24). (Complaint, par. 15).

Nextlink was trading at $70.94 a share on the day that Mr. Daniels exercised his stock options. At that price, the value of Mr. Daniels' options was an eye-popping $16,686,932.00. (Complaint, par. 7).

Alas, the $70.94 stock price reflected the success of the third-party fraud on the stock market more than it did the value of the product that Mr. Daniels helped to create. During calendar year 2000, the trading value of Nextlink stock dropped precipitously. Nextlink itself became insolvent and by late 2001 its stock was worthless. (Complaint, par. 7).

Nonetheless, the incentive stock options were a form of wage to Mr. Daniels subject to income tax. The Daniels filed their joint 1040 return for tax-year 2000 in or about October, 2001. By that time the still-undetected fraud had caused the

collapse of the telecommunications sector of the stock market. Since the IRS normally considers trading price of a stock its fair market value for tax purposes, the value of the 235,226 shares Mr. Daniels exercised in January, 2000 was reported to the IRS by that standard of measure. This resulted in an adjusted gross income of $14,599,852.00 and a tax assesment of $5,551,756.00. The tax liability was offset by a federal income tax withholding the Daniels paid of $3,950,169.00. (Complaint, par. 8-9).

The fraud on the market was subsequently exposed and widely reported. *See*, D. Reingold, *Confessions of a Wall Street Analyst*, *supra*, at bibliography at 316-24. The Daniels' timely amended their tax return in or about April, 2004 on the ground that due to the fraud, the $70.94 trading price the day the options were exercised was not the stock's fair market value. Fair market value is the standard of measure Congress requires to calculate tax liability. *26 U.S.C. 83 & 1001(b)*. The amended return claimed a corrected adjusted gross income of $925,813.00 and a tax of $107,495.00. Since the Daniels had already paid nearly $4 million in taxes, they claimed they were entitled to a refund. (Complaint, par. 9-11).

This is when the Daniels entered Wonderland. Throughout the process by which the Daniels' exhausted their administrative remedies, and with which the Daniels fully

cooperated, (Complaint at par. 16), the IRS steadfastly refused to value the 235,226 shares by any measure other than the $70.94 trading price, notwithstanding the by now well-reported fraud on the telecommunications sector of the stock market. On March 24, 2005, the IRS disallowed the amended tax return and on January 23, 2006, it denied the Daniels' appeal of the disallowance. (Ex. A attached to Daniels' Affidavit).

Furthermore, with a logic that only Lewis Carroll might appreciate, the IRS claimed Mr. and Mrs. Daniels *owed* more than *$2 million* in taxes and interest. (See Gov't. Ex. A). This was in *addition* to the nearly $4 million they already paid and of which our Government has had the benefit since 2001. (Complaint, par. 10-13,16).

Not surprisingly, Mr. Daniels' wage earnings do not generate sufficient income to pay what the IRS demands, (Daniels Aff. at 4). Faced now with a very personal example of the maxim that the power to tax is the power to destroy, and with all their efforts to deal reasonably with the IRS proved fruitless, (*see, e.g.*, Gov't. Ex. A, denial of Offer in Compromise), Mr. and Mrs. Daniels filed a lawsuit for a refund in the United States District Court for the District of New Jersey, based upon *28 U.S.C. 1346(a)(1)*. On February 9, 2007 the District Court dismissed the claim for lack of

subject matter jurisdiction, per *Flora v. United States, 362 U.S. 145 (1960)*. (Ex. B).

The Daniels filed the instant Complaint in the Federal Court of Claims on or about Dec. 13, 2006, after the Government had filed its motion to dismiss in the District Court and, indeed, after the motion return date. The jurisdiction of the Court of Federal Claims is grounded upon *28 U.S.C. 1491(a)*, in addition to *28 U.S.C. 1346(a)(1)*.

The Government again moves to dismiss in lieu of pleading. It contends again that this court has no subject matter jurisdiction because the Daniels have not paid the full $5,551,756.00 in taxes; a calculation the IRS continues to base on a fraudulently inflated stock price.

ARGUMENT

THE COURT HAS SUBJECT MATTER JURISDICTION

In 1960 the Supreme Court imposed a fairly bright-line rule that the taxpayer’s full payment of the assessment is a prerequisite to the subject matter jurisdiction of the *District Court* in a tax refund action. *Flora v. United States, 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed. 2d 623 (1960).* The Court considered the question against a historical backdrop in which District Courts had exercised subject matter jurisdiction in tax refund cases even though only partial payment had been made.

The Court noted that historically a remedy was always available to a taxpayer to challenge an illegal assessment; originally it was a common-law action for assumpsit against the tax Collector. *Id. at 153.* This was followed by the Tucker Act, now *28 U.S.C. 1491(a)*. *Id. at 153.*

The Supreme Court later amplified upon *28 U.S.C.1346(a)(1)* and its connection to the common-law remedy of assumpsit. *United States v. Williams, 514 U.S. 527, 115 S.Ct. 1611 (1995)*. It called the language of *28 U.S.C.1346(a)(1)* "broad", that:

> "mirrors the broad common law remedy the statute displaced: actions of assumpsit for money had and received, once brought against the tax collector personally rather than against the United States. Assumpsit afforded a remedy to those who… had paid money they did not owe-*typically as a result of fraud*, duress or mistake.” [*Id.* at 532, (emphasis added; citations omitted)].

It is evident from the carefully-reasoned majority and dissenting opinions in *Flora, supra,* that the Court was persuaded on balance that the potential abuse to the system of tax collection if a refund action was maintained without full payment was less tolerable than the potential abuse of power caused by an overly-rigid tax collection system that was not regularly subject to accountability by an Article III judiciary and a jury. Thus, the court said:

> "… the Government has a substantial interest in protecting the public purse, an interest which would be substantially

> impaired if a taxpayer could sue in a District Court without paying his tax in full. It is instructive to note that, as of June 30, 1959, tax [deficiency] cases pending in the Tax Court involved $920,046,748, and refund suits in other courts involved $446,673 640. [*Flora, supra, 362 U.S. at 175*].

The court amplified on this in a footnote, quoting a legal commentator:

> "Permitting refund suits after partial payment of the tax assessment would benefit many taxpayers. Such a law would be open to wide abuse, and would probably seriously impair the government's ability to collect taxes. Many taxpayers, *without legitimate grounds for contesting an assessment*, would make a token payment and sue for refund, hoping at least to reduce the amount they would ultimately have to pay. In jurisdictions where the District Court is considered to be a 'taxpayer's court' most taxpayers would use that forum instead of the Tax Court. Conceivably such legislation could cause the chaotic tax collection situations which exist in some European countries, since there would be strong impetus to a policy of paying a little and trying to settle the balance". [*Id. at 176, n. 41(emphasis added, citation omitted)*].

But what was just as salient to the Court's analysis *in Flora* was that the aggrieved taxpayer there had a meaningful judicial forum, even if that forum was an Article I court. Thus, the Court described at length the "front-end" remedy available before the Board of Tax Appeals to: "secure a determination of tax liability before payment of the deficiency." *Id. at 158. See, generally discussion, 158-163*. Justice Whittaker, in his dissent distilled the remedial scheme as follows:

> "The Government argues, with some force, that our tax legislation as a whole contemplates the Tax Court as the

forum for adjudication of deficiencies, and the District Courts and the Court of Claims as the forum for adjudication of refund suits. This, in general,is true..." [*Id. at 392 US at 193*].

In *Flora, t*he Supreme Court focused exclusively upon the subject matter jurisdiction of the District Court in its construction of *28 U.S.C. 1346(a)(1)*, notwithstanding the concurrent jurisdiction of the Court of Federal Claims per the statute itself. I*d. at 148*. The Court’s sole focus on the District Court is likewise noteworthy considering the Court was aware that the Court of Federal Claims had exclusive subject matter jurisdiction of some refund suits. (*See, e.g*., opinion of Whittaker, J., discussing the jurisdictional scheme for refund cases in excess of $10,000.00: either a suit in the District Court against the Collector personally or a suit against the United States in the Court of Claims. *(Id. at 189))*.

Tax refund suits in the Court of Federal Claims are “a "class of proceedings [that] constitutes the largest component of the court's business.” *Wright & Miller, vol. 17, sec. 4101 & n. 106.* Sometime after *Flora* was decided, the Court of Federal Claims extended *Flora’s* full-payment rule that the Supreme Court itself only imposed upon the subject matter jurisdiction of the District Court to tax refund cases filed before it, regardless of whether the jurisdiction asserted was

*28 U.S.C. 1346(a)(1)* or *28 U.S.C. 1491(a). See, e.g., Rodewald v. United States, 231 Ct.Cl. 962 (Not reported in F. Supp.) (Ct. Cl. 1982)* and cases cited therein. The Federal Circuit Court endorsed the practice without independent analysis:

> "the full payment rule of *Flora* has long been applied by the Claims Court, and before that by the Court of Claims, to dismiss tax refund suits against the United States when the assessment has not been paid in full prior to commencement of the action [*Rocovich v. United States, 933 F2d 991, 993-994* citing Claims Court cases from 1979-1989(citations omitted)].

In *Shore v. United States, 9 F.3d 1524 (Fed. Cir., 1993)*, the Circuit Court further explained its endorsement in *Recovich.* There, the court ruled that full payment of interest and penalties was not required in a refund action to vest the Court of Federal claims with subject matter jurisdiction. The court said in a footnote:

> “This court's decision in *Rocovich v. United States, 933 F.2d 991 (Fed. Cir. 1991)*, did not hold that full payment of penalties and interest may be a jurisdictional prerequisite to maintaining a tax refund suit. *Rather, this court merely cited Lambropoulos v. United States, 18 Cl. Ct. 235, 237 (1989) as an example of how the Flora v. United States, 357 U.S. 63, 78, 2 L. Ed. 2d 1165, 78 S. Ct. 1079 (1958), full payment rule has been interpreted by the Court of Federal Claims. Rocovich, 933 F.2d at 993-94. Rocovich* involved an estate that had elected to pay its federal estate tax liability in installments pursuant to *28 U.S.C. § 6166*. The estate sought to maintain a tax refund suit before having paid the full amount of the estate tax assessment. This court held that the estate tax was not a divisible tax and thus a partial payment of the estate tax does not satisfy the Flora full payment rule. *Rocovich*, however, did not squarely address the issue of whether the estate must pay the interest or penalties

assessed in order to support subject matter jurisdiction before the Court of Federal Claims. [*Id. at 1526, n.4*].

In *United States v. Williams, supra, 514 U.S. 527* the Supreme Court rejected the Government's argument that a voluntary payer of a tax had no standing to sue for refund under *28 U.S.C. 1346(a)(1)*. There, the tax was owed by Ms. Williams' ex-husband. The Government placed a lien on the former marital property that Ms. Williams had acquired in the divorce proceedings. She paid the tax under protest in order to close a sale of the property. The District Court granted the Government's motion to dismiss for lack of standing and the Circuit Court reversed.

The Supreme Court affirmed. Key to the Court's analysis was that a refund action under *28 U.S.C. 1346(a)(1)* was the only recourse the voluntary taxpayer had. The Court said: "we do not believe Congress intended to leave parties in respondent's position without a remedy".

*Williams* and *Flora* make clear that Supreme Court interprets *28 U.S.C. 1346(a)(1)* to require a substantive judicial forum to a taxpayer who has a *bona fide* refund dispute. The Court's interpretation, moreover, is wholly aligned with the First Amendment guarantee of the right to petition the Government for redress of grievances. (U.S. Const. Amend. I).

Broadly speaking, the First Amendment right to petition the Government for redress of grievances encompasses a right of access to the courts to substantive review of colorable claims. *See discussion*, *BE&K Const. Co. v. NLRB, 536 U.S. 516, 524-537, 122 S.Ct. 2390, 2395-2402 (2002)*. *See also*, *California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609 (1972)*; *Brotherhood of R.R. Trainmen v. Virginia ex. Rel. Virginia State Bar, 377 U.S. 1, 84 S. Ct. 1113 (1964)*; *Hill v. City of Scranton, 411 F3d 118 (3d Cir. 2005).* In this aspect, the right is akin to substantive due process. *Snyder v. Nolan, 380 F3d 279 (7th Cir. 2004) rehearing en banc den*. The right has been recognized as applying to colorable civil actions involving tax laws. *Connor v. C.I.R., 770 F2d. 17(2d Cir. 1985)*.

The Government supports its motion here with evidence of an assessment and takes the position that full payment *vel non* is the only fact material to the question of the court's subject matter jurisdiction. (Gov't. Ex. A). (It is noted, incidentally, that the Government did not redact Mr. and Mrs. Daniels' social security numbers on this exhibit – an injury to them that is now difficult to undo.)

An assessment of tax liability is a term of art. *26 U.S.C. 6201* requires the Secretary of the Treasury to make the "assessments of all taxes". When the amount of tax paid is

less than the assessment, a notice of deficiency is issued to the taxpayer. *26 U.S.C. 6211 & 6212*. The notice triggers the right to petition the Tax Court to contest the deficiency. *26 U.S.C. 6213*.

The taxpayer in *Flora* had an opportunity to challenge the deficiency in Tax Court, an opportunity he let pass in favor of filing a refund claim in the District Court. (*Flora v. United States, supra, 362 U.S. at 147:* after Commissioner levied a deficiency assessment, the petitioner paid a portion; filed for a refund and then initiated a refund lawsuit in the District Court after the claim was disallowed).

Mr. and Mrs. Daniels' situation is different. They amended their tax return *before* the IRS issued a notice of deficiency. (Complaint, par. 10; Daniels aff. at par. 2). The IRS then reviewed the amended complaint and *denied the amendation*. Thus, the Daniels never had an opportunity to challenge the deficiency assessment in the Tax Court because a notice never issued. Indeed, the letter denying the Daniels' amended tax return states:

> "[i]f you wish to bring suit or proceedings for the recovery of any tax, penalties or other monies for which this disallowance notice is issued, you may do so by filing suit with the United States District Court having jurisdiction, or the United States Claims Court." (Daniels Aff., Ex. A).

Thus, the Court of Federal Claims is the Daniels *only* forum for a substantive hearing on the merits of their refund claim, inasmuch as the jurisdiction of the Tax Court was never triggered and inasmuch as the *Flora* full payment rule specifically bars the District Court from subject matter jurisdiction; a rule the Supreme Court itself never extended to the Court of Federal Claims. *United States v. Williams, supra.*

In considering the Government's motion to dismiss, the court must take as true all the factual allegations of the Complaint and must draw all reasonable inferences in the Daniels' favor. *Murray v. United States, 918 F.2d 185 (Fed. Cir. 1990)*. Here, the Daniels are prepared to prove and the court must accept as true that the $70.94 stock trading price the day Mr. Daniels exercised his stock options was as a result of a third-party fraud on the market. (Complaint, par. 15).

The Daniels' claim of a fraud on the market that affected the stock trading price is more than hypothecation, moreover. The SEC and the New York Attorney General obtained relief for activity that included the fraudulent manipulation of Nextel/XO Communications. *See, e.g., SEC v. Citigroup Global Markets, etc., http://www.sec.gov /litigation/complaints/*

*comp18111.htm. See also,* D. Reingold, *Confessions of a Wall Street Analyst*, 2006(Collins)(with bibliography at 316-24) And in December, 2006, Congress enacted and the President signed HR 6111. Among other things, this bill provided tax relief to employees of high-tech firms whose compensation in the years 1999-2001 included participation in qualified incentive stock option plans and who were subject to AMT rules. Congress afforded tax relief because that the stocks at issue were overvalued at the time the taxable event occurred. *See generally, Wall Street Journal, 12/13/06, p. 6.*

HR 6111 did not afford tax relief to Mr. and Mrs. Daniels because Mr. Daniels participated in a nonqualified stock option plan and his tax calculation was not a result of AMT rules. What is similar is the fact that Mr. Daniels was employed in the telecommunications industry - the high-tech sector of the stock market - and exercised his stock options in January, 2000. The bill's passage is a further indication, however, of the colorable nature of the Daniels' tax refund claim.

The party seeking subject matter jurisdiction bears the burden of proving it. *Rocovich, supra, 933 F.2d 991*. Here, the Daniels have shown they have a colorable claim that the IRS's assessment of their income tax is based upon its use of a fraudulent stock trading price to calculate the tax; a claim

for which a remedy existed even under the common-law claim of assumpsit. *United States v. Williams, supra, 514 U.S. 527 (1995).*

Moreover, the Court of Federal Claims is the only judicial forum available to the Daniels. The IRS never issued a notice of deficiency that would trigger the jurisdiction of the Tax Court. (Daniels Aff. at par. 2). The Daniels sought the subject matter jurisdiction of the District Court, which it held it did not have. (Ex. B). The Daniels have no other form than the Court of Federal claims to reach the substance of their refund claim.

Given all of these facts, and given that the Supreme Court has consistently interpreted *28 U.S.C. 1346(a)(1),* to afford a taxpayer a meaningful forum for substantive consideration of a refund claim, the Daniels have met their burden of establishing a subject matter jurisdiction of this court. *Williams, supra*. Since the Daniels claim is colorable, moreover, their right to substantive review by a judicial forum is of constitutional dimension. *BE&K Const. Co. v. NLRB, supra*.

As for the full payment rule, the Supreme Court never applied that rule to the Court of Federal Claims; the Court of Federal Claims did. The Federal Circuit Court endorsed that extension without anything like the analysis of the Supreme

Court in *Flora*. *Rocovich v. United States, supra; Shore v. United States, supra*.

It is obvious from reading some of the published opinions from the Court of Federal Claims that citizens attempt to avoid their duty to pay a duly-imposed tax by filing frivolous refund claims. It is therefore wholly understandable that a court would adopt a policy to minimize this form of abuse. But the Daniels are not tax abusers; after all, they have paid nearly $4 million in taxes; no nominal sum. And even the amount the Daniels claim they owe, nearly $200,000.00, is still a substantial sum.

The Federal Courts have a “strict duty to exercise the jurisdiction that is conferred upon them by Congress”. *Colorado River Water Conservation District v. United States, 424 U.S. 800, 821, 96 S.Ct. 1236, 1248 (1976)*. (abstention doctrine). And the question before the court here is substantial; may the IRS value a compensation event - namely, the exercise of stock options - at a trading price affected by a third-party fraud? After all, the measure of valuation the IRS must use is "*fair* market value” *26 U.S.C. 83 & 1001(b)*(emphasis added). How can a trading price affected by a fraud unknown to the buyer and seller be the fair measure of value for tax purposes?

It is certainly unfortunate that a more reasonable outcome for this exceptional circumstance was not reached pre-suit. (*See*, Govt. Ex. A, Offer in Compromise denied). After all, the Daniels paid $4 million in income taxes in 2001; how many American wage-earners do that? But the Government insists upon using the stock trading price to value the tax due from the Daniels. In so doing, the Government seeks to *benefit* from the fraud itself!

It is anticipated that the Government, in reply, may suggest to the court that the Daniels could have sold the stock once they acquired it, and would, thus, have been able to afford their tax bill. But this ignores the *incentives* the Government has placed in the tax code to *hold* stock once it is acquired; stock held for more than one year is subject to long-term capital gains tax rate at the time of the sale. Stocks that are sold within a year after acquisition are subject to short turn capital gains; a significantly higher tax rate. (*See, generally*, IRS 2006 Instructions for Schedule D). In any event, it is surely disingenuous for the Government to assert that the Daniels could have averted the shortfall in the tax owed through the further perpetuation of the fraud by means of the sale of their stock to yet another unsuspecting purchaser.

To seek to profit from a fraud ought to be an unthinkable course of action by our Government. That our Government seeks, further, to avoid judicial accountability for its actions only compounds the unthinkable. It is most respectfully submitted that substantial justice requires that the Government's motion to dismiss this case must be denied.

CONCLUSION

The Government's motion to dismiss should be denied.

Respectfully submitted,

s/Catherine M. Brown
Catherine M. Brown, Esq.

CERTIFICATE OF SERVICE

I certify that on this date I served a copy of the Daniels' opposition brief, Affidavit with Ex. A, and Ex. B upon the Government via efiling to counsel for the Government: benjamin.c.king@usdoj.gov.

I swear under penalty of perjury the foregoing statement is true.

s/Catherine M. Brown
Catherine M. Brown, Esq.

Dated: April 25, 2007